**TEXAS EMPLOYERS' INSURANCE ASSOCIATION, Appellant,**

**v.**

**Homer M. ELLIS, Appellee.**

No. 7393.

Court of Civil Appeals of Texas.

Texarkana.

Feb. 12, 1963.

Rehearing Denied March 12, 1963.

Atchley, Russell & Hutchinson, Texarkana, for appellant.

Bird Old, Jr., Russell & Perkins, Mt. Pleasant, for appellee.

DAVIS, Justice.

A Workmen's Compensation case. Plaintiff-appellee, Homer M. Ellis, sustained an accidental injury on May 7, 1959, while working for the Lone Star Steel Company. Defendant-appellant is Texas Employers' Insurance Association, the insurer.

The injury actually occurred while the appellee was working as a slitter operator. At the time of the injury, he was in the process of changing the slitter knives on the slitter machine. The knives were about 24 inches in diameter, approximately 3 inches thick, circular in shape, and weighed about 150 pounds. The slitter machine is supposed to slice off the rough edges of the iron, or to cut it. The knife fell and hit the appellee in the lower part of the stomach, and he fell backward, his back hitting a protruding bolt. The total injuries consisted of a hernia and a bulge, or ruptured disc in the spine. The appellee submitted to surgery for the hernia. The appellant admitted the injury, admitted its liability, tendered and demanded in writing that the Board require the appellee to submit to an examination and a report by a physician, and in the event the Board unanimously found that the appellee could safely submit to surgery to the spine, that the Board order him to report for such surgery. The Board ordered the examination, and that the appellee report to Dr. Marvin P. Knight, an orthopedist in Dallas, Texas, for surgery. The appellee refused the surgery, because, in his opinion, it would be more than ordinarily unsafe. The Industrial Accident Board entered its final order based upon the refusal of the appellee to submit to surgery, and allowed him only 52 weeks of Workmen's Compensation.

The case was tried before a jury. There was no pleading or special issues submitted as to the hernia. In response to the special issues submitted, the jury found that the appellee sustained total and permanent disability as a result of the injury. The jury also found in response to the special issues submitted as to surgery as follows:

"SPECIAL ISSUE NO. 10

"Do you find from a preponderance of the evidence that it would have been more than ordinarily unsafe for plaintiff, Homer M. Ellis, to have submitted to the operation on his back?

"Answer 'Yes' or 'no'.

"Answer: 'Yes'.

"SPECIAL ISSUE NO. 11.

"Do you find from a preponderance of the evidence that between December 21, 1960 and January 10, 1961 that plaintiff, Homer M. Ellis, *was in such physical condition, at that time, that the operation to his back would have been more than ordinarily unsafe?* (Emphasis added)

"Answer 'Yes' or 'no'.

"Answer: 'No'.

"SPECIAL ISSUE NO 12.

"Do you find from a preponderance of the evidence that the plaintiff, Homer M. Ellis, on his refusal to accept sur-

gery, *was not diseased or had other physical condition which rendered the operation more than ordinarily unsafe?* (Emphasis added)

"Answer: 'not more than ordinarily unsafe' or 'more than ordinarily unsafe'.

"Answer: 'not more than ordinarily unsafe'."

■■ There were no special issues submitted as to whether or not (in the event the jury should find that the operation would not be more than ordinarily unsafe) such an operation would cure the appellee, or would relieve his condition, or would materially benefit him. In the event of such jury findings, it would be necessary for the trial court to submit such issues as to whether or not such an operation would cure the injured employee, or would relieve his condition, or would materially benefit him. Then, the trial court should submit an issue, based upon such jury findings as to the percentage of permanent partial disability that the injured employee would suffer after the operation, based upon the evidence introduced at the trial. Since the jury found in favor of the appellee, it is not necessary for this court to presume that the trial court found in favor of the appellee on such issues. Rule 279, Texas Rules of Civil Procedure. Walker v. Texas Employers' Insurance Association, 155 Tex. 617, 291 S.W.2d 298; Dee v. Parish, 160 Tex. 171, 327 S.W. 2d 449. No objections or exceptions were submitted to the charge of the court for failure to submit such issues.

Motions were presented for judgment by the appellant and by the appellee. The trial judge overruled the motion of the appellant, and entered a judgment for the appellee for total and permanent disability benefits. The appellant excepted and brings forward five points of error.

By its points 1 and 2, appellant contends the trial court erred in entering judgment for appellee because appellant having admitted liability while the claim was pending before the Industrial Accident Board, tendered surgery and made demand therefor in writing; the Board had ordered such surgery, and such surgery had been refused by the appellee, then judgment should have been entered for 52 weeks compensation, less payments previously made; and, alternatively, to disregard the finding to special issue No. 11, and entered judgment on the remaining jury findings.

According to the evidence, the appellee had previously submitted to surgery for the hernia. He was operated on in Mt. Pleasant, Texas, by Dr. John M. Ellis, the family physician, and a first cousin of the appellee, and Dr. Thomas W. Renfroe. The appellant paid for this operation. The appellee refused the disc surgery based upon personal reasons; the advice that had been given to him by Dr. Ellis and Dr. Renfroe, as well as other evidence that might be deduced from the testimony of Dr. Casey Patterson, a neurosurgeon of Dallas, Texas, Dr. Marvin P. Knight, an orthopedic surgeon of Dallas, Texas, and Dr. Milton Frieberg, an orthopedic surgeon of Tyler, Texas, and because of the physical condition of his wife.

All the doctors testified as to the type of disc operation. How all the nerves of the body extend through the spinal cord and protrude through the joints of the spine; how a bulge, or a ruptured disc, affects the nerves. In such an operation how you have to split the back and remove the muscles or ligaments of the body away from the vertebra, pry the vertebra open and proceed to remove the disc. There was much discussion as to whether or no a spinal fusion would be necessary. Dr. Knight, the man that was ordered to perform the operation by the Industrial Accident Board, swore that he would have done a spinal fusion of the appellee. Such a spinal fusion is done by the securing of bone from other parts of the body, by chiseling separate pieces of bone about a half-inch wide and 1½ inch to 2 inches long and placing that along the vertebra of the spine, with the hope that it would fuse and make the spine rigid (stiff).

Only Dr. Knight testified that a spinal fusion of the spine would be necessary. They all testified that the removal of the disc would be necessary. Dr. Knight testified as to the removal of discs as follows:

"Q. Suppose you took them all out, what would happen to the patient?

"A. He would be in a hell of a mess."

All the doctors testified that the spinal operation, if successful, would relieve a major portion of the pain. Dr. Patterson actually said that it would *not* relieve all of it. Dr. Knight further testified that after the appellee had the operation that "I wouldn't guarantee you you're going to get home." Dr. Renfroe testified about the spinal operation and the spinal fusion, and the period it would take the patient to heal, as follows:

"Q. And then what do you do with that piece of bone that is chipped off?

"A. Well, these pieces of bone are laid over the repaired disc site, and through their osteoblastic and osteoplastic activity, which are the bone producing cells, they cement in this area and give the patient a more or less rigid spine.

"Q. In other words, Doctor, I will ask you to tell the jury whether or not that this spinal fusion that you are talking about the bone is removed and placed in the spine of the individual?

"A. Yes, sir.

"Q. And it is placed at the particular point where the disc has been removed isn't it?

"A. Yes, sir.

"Q. And is that placed there, Doctor, in the nature of what we might say 'grafted on there'?

"A. So to speak, yes, sir.

"Q. Well, state whether or not it has to actually grow to the other bone?

"A. Yes, sir. It will grow to the other bones.

"Q. Well, does it have to, Doctor, before it will become fixed there?

"A. Yes, sir.

"Q. Now, Doctor, assuming that the patient Homer M. Ellis had had disc surgery with spinal fusion, how long in your opinion would it be before this bone will fuse with the spine completely? If it is performed successfully, how long will it be before that bone will actually fuse and be tied to the spine, if the operation is successful in every respect how long would it be ordinarily?

"A. Several weeks to several months.

"Q. Does it vary in individual cases?

"A. Yes, sir.

"Q. During all that period of time what does the patient have to do?

"A. Well, as a professor of mine used to say 'pack them in peach fuzz and don't even let a cat tromp through the room.'

"Q. I beg your pardon, the professor said what?

"A. Pack them in peach fuzz and don't even let a cat tromp through the room.

"Q. Why? Why would he have made that statement?

"A. Well, they have to be pretty quiet and pretty still, they can't do any heavy lifting or anything. * * *"

Dr. John M. Ellis testified as to several experiences he had with the appellee. He testified about the appellee becoming nause-

ated and vomiting, and about the many experiences that he had had with back operations. He knew the physical condition of the appellee probably more than any other person. He testified that the spinal operation was unwarranted, and that it would not cure or substantially improve his condition. He further testified that the operation was a 'bum operation' and that he advised the appellee not to have disc surgery. Dr. Ellis was also the doctor of appellee's wife. He testified that she had rheumatoid arthritis and had been an invalid or semi-invalid for over a year. Appellee had two children at home, a boy five years of age, and a girl fourteen. At the time of ordering the operation the appellee's wife was confined to her bed at home.

Dr. Milton Frieberg testified as to the disc surgery, and stated that in his opinion a spinal fusion was not actually necessary. He also testified that he would not guarantee the results of such an operation and would not operate upon the appellee unless he was perfectly willing. As to the result of the operation he testified as follows:

"Q. No, sir; I think you are trying to be fair, and I think you will be fair, and I would like for you to think that over and I think this Jury would want to know the answer to that. And if you want to take a few minutes then you can come back to the witness stand.

"A. I would like to just sit here and think about it. I would say without any detailed review of all the surgical procedure that it's possible to demand about the only way I could be fair about it is just thinking in terms of two groups, and this 50% had the best results and this 50% had the worst results. I would have to put it in that group of 50% where the results were not as good as the first 50%.

"Q. In other words, you would put the operation for the removal of a herniated disc and spinal fusion in the worst 50%?

"A. I would.

"Q. And when you say the worst 50% you mean the 50% that are the most unsafe operations, don't you?

"A. Unsafe from the standpoint of predicting the end result.

"Q. Yes, sir, that is improvement or results?

"A. Yes, sir. * * *"

At most, the Doctor would not swear that more than 50% of such operations would be successful.

■ There is no contention that the issues of surgery are not involved in this lawsuit. The appellee actually plead and proved that liability had been admitted, that the operation had been tendered and demanded in writing while the claim was pending before the Industrial Accident Board. That the Industrial Accident Board had ordered the examination and the operation. The appellee had refused the surgery because he felt that it would be more than ordinarily unsafe. The Supreme Court, in Hardware Mutual Casualty Company v. Courtney et vir, 363 S.W.2d 427 has laid down the law in such cases. The appellee, however, is not bound by the Supreme Court decision. He admits that it is upon him to prove that such an operation would be more than ordinarily unsafe. This he did by a preponderance of the evidence, and the jury so found. This court is bound by the jury findings. There is one case of like import that the Court of Civil Appeals in Fort Worth, Texas Employers' Insurance Association v. Chancellor, Tex.Civ.App., 292 S.W.2d 360, W.R., N.R.E., reversed and remanded the case because the insurance company had apparently done what the appellant had done in this case. The trial court sustained a motion that Texas Employers' Insurance Company could not make any proof of the effects of surgery, and in-

structed it to inform its witnesses not to so testify. The trial judge did not submit to the jury a special issue as to whether or not an operation would not be more than ordinarily unsafe.

There has been one other case, Travelers Insurance Company v. Garcia, Tex.Civ.App., 360 S.W.2d 415, in which the Court of Civil Appeals reversed and rendered a judgment of the trial court. The Supreme Court has granted a writ of error. In that case, the Court of Civil Appeals discussed the question of whether or not Garcia could still consent to the operation. The courts can not, under any theory of reasoning, order or supervise such an operation. American Surety Co. of New York v. Mays, Tex.Civ.App., 157 S.W.2d 444, error refused. The question of the operation has to be decided while the case is pending before the Industrial Accident Board.

The holdings in the following cases are not in point here: Texas Employers Insurance Ass'n v. Kubiak, Tex.Civ.App., 276 S.W.2d 909, W/R., N.R.E.; American General Insurance Company v. Quinn, Tex. Civ.App., 277 S.W.2d 223; Texas Employers' Insurance Association v. Curry, Tex.Civ.App., 347 S.W.2d 334, er. ref.; Truck Insurance Exchange v. Seelbach, 161 Tex. 250, 339 S.W.2d 521; Hardware Mutual Casualty Company v. Courtney et vir, supra. In those cases the insurance company did not admit liability, did not tender an operation, nor make a demand in writing therefor while the claims were pending before the Industrial Accident Board. In this case, the insurer admitted liability, tendered the operation, made a demand therefor in writing, and the employee refused the operation. The Industrial Accident Board based its reward upon such refusal. The employee excepted and filed his petition in the district court on the theory that the operation ordered by the Industrial Accident Board would be more than ordinarily unsafe. This was done in accordance with the provisions of the law. Art. 8306, Sec. 12b and 12e.

Art. 8306, § 12b provides, in part, as follows:

" * * * In all such cases where liability for compensation exists, the association shall provide competent surgical treatment by radical operation. *In case the injured employé refuses to submit to the operation*, the board shall immediately order a medical examination of such employé by a physician or physicians of its own selection at a time and place to be by them named, at which examination the employé and the association, or either of them, shall have the right to have his or their physician present. The physician or physicians so selected shall make to the board a *written report, signed and sworn to,* setting forth the facts developed at such examination and giving his or their opinion as *to the advisability or non-advisability of an operation.* If it be shown to the board by such examination and such report thereof and the expert opinions thereon that *the employé has any chronic disease or is otherwise in such physicial condition as to render it more than ordinarily unsafe* to submit to such operation he shall, if *unwilling to submit to the operation,* be entitled to compensation for incapacity under the general provisions of this law. If the examination and the written report thereof and the expert opinions thereon then on file before the board *do not show* to the board the existence of *disease* or other *physical condition* rendering the operation more than ordinarily unsafe and the board shall unanimously so find and so reduce its findings to writing and file the same in the case and furnish the employé and the association with a copy of its findings, then if the employé with the knowledge of the result of such examination, such report, such opinions and such findings, thereafter *refuses to submit* within a reasonable time, which time shall be fixed in the findings of the board, to such operation, he shall be en-

titled to compensation for incapacity under the general provisions of this law for a period not exceeding one year." (Emphasis added).

Art. 8306, Sec. 12e, reads as follows:

"In all cases where liability for compensation exists for an injury sustained by an employé in the course of his employment and a surgical operation for such injury *will effect a cure* of the employé or *will materially and beneficially improve* his condition, the association or the employé may demand that a surgical operation be had upon the employé as herein provided, and the association shall provide and pay for all necessary surgical treatment, medicines and hospital services incident to the performance of said operation, *provided the same is had.* In case either of said parties demands in writing to the board such operation, the board shall immediately order a medical examination of the employé in the same manner as is provided for in the section of this law relating to hernia. If it be shown by the examination, report of facts and opinions of experts, *all reduced to writing and filed with the board,* that such operation is advisable and *will relieve the condition* of the injured employé or *will materially benefit him,* the board shall so state in writing and upon unanimous order of said board in writing, a copy of which shall be delivered to the employé and the association, shall direct the employé at a time and place therein stated to submit himself to an operation for said injury. If the board should find that said *operation is not advisable,* then the employé shall continue to be compensated for his incapacity under the general provisions of this law. If the board shall *unanimously find* and so state in writing that said operation is advisable, it shall make its order to that effect, stating the time and place when and where such operation is to be performed, naming the physicians therein who shall per-

form said operation, and *if the employé refuses to submit to such operation,* the board may order or direct the association to suspend the whole or any part of his compensation during the time of said period of refusal. *The results of such operation, the question as to whether the injured employé shall be required to submit thereto and the benefits and liabilities arising therefrom shall attach, be treated, handled and determined by the board in the same way as is provided in the case of hernia in this law."* (Emphasis added.)

■■ In construing the foregoing two sections, it must be determined whether or not the operation was a major operation, and whether or not the appellee is required to take such an operation, regardless. Such is not the intention of the two articles. This surgery, with spinal fusion, is a major operation. Under the evidence in this case, the jury found that the appellee could not safely undergo such an operation. On appeal to the district court, the case was tried de novo. 99 C.J.S. Workmen's Compensation § 287b, p. 969. The appellee was successful in getting a jury finding that such an operation would not be safe. This the appellee had a perfect right to do. An injured employee is not compelled to submit to surgery. 99 C.J.S. Workmen's Compensation § 319, p. 1145. The point is overruled.

■ By its third point appellant says the trial court erred in entering judgment for appellee because the answers to Special Issues ten, eleven and twelve are in irreconcilable conflict. Special issues No. 11 and 12 are surplusage. No. 11 inquires about his physicial condition other than the injury to his back between Dec. 21, 1960, and Jan. 10, 1961. Special Issue No. 12 inquires about disease or other physical condition which rendered the operation ordinarily unsafe. The evidence showed that the appellee had previously been a healthy, robust man who had never suffered from any disease of any kind prior to the injury. Any

other answer of the jury would have been untrue. The answers are not in conflict with the answer to special issue No. 10. The point is overruled.

Appellant's points four and five are without any merit and are overruled.

The judgment of the trial court is affirmed.